1  ZIMMERMAN REED LLP
   Hart Robinovitch (AZ Bar No. 020910)
2    E-mail: hart.robinovitch@zimmreed.com
   14646 North Kierland Boulevard, Suite 145
3  Scottsdale, AZ 85254
   (800) 493-2827 Telephone
4  (480) 348-6415 Facsimile

5  SQUITIERI & FEARON LLP
   Lee Squitieri (*pro hac vice pending*)
6    E-mail: lee@sfclasslaw.com
   305 Broadway, 7th Floor
7  New York, NY 10007
   (212) 421-6492 Telephone
8
   *(Additional counsel listed on signature page)*
9
   *Attorneys for Plaintiffs and Proposed Class*
10

11            **UNITED STATES BANKRUPTCY COURT**
12               **DISTRICT OF ARIZONA**
13

| | |
|---|---|
| 14  In re SHURWEST LLC, | Chapter 11 Proceedings |
| 15       Debtor. | |
| 16  ELEANOR and ROCCO CIOFOLETTI, and | Adv. Case No: _____ |
| 17  LARRY STOSPAL on behalf of themselves and all others similarly situated, | Case No.: 2:21-bk-06723- DPC |
| 18       Plaintiffs, | **ADVERSARY CLASS ACTION COMPLAINT** |
| 19  -vs- | |
| 20 | Jury Trial Demanded |
| 21  THE QUANTUM GROUP USA, LLC; SHURWEST, LLC; SECURIAN | |
| 22  FINANCIAL GROUP, INC.; MINNESOTA LIFE INSURANCE COMPANY; and | |
| 23  SECURIAN LIFE INSURANCE COMPANY, | |
| 24 | |
| 25       Defendants. | |

26
27
28

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................1

II.  JURISDICTION AND VENUE .........................................................................2

III. PARTIES ............................................................................................................3

IV.  CLASS ACTION ALLEGATIONS ....................................................................5

V.   SUBSTANTIVE ALLEGATIONS .....................................................................7

    A.   DEBTOR-SHURWEST'S ROLE IN THE FIP SCHEME ........................7

    B.   QUANTUM IS DEBTOR-SHURWEST'S ALTER EGO/SUCCESSOR-IN-INTEREST ......10

    C.   THE SHURWEST BROKER NETWORK ................................................12

    D.   MLIC AND/OR SLIC WERE FIDUCIARIES TO PLAINTIFFS AND CLASS MEMBERS BECAUSE THEY USED "FINANCIAL ADVISORS" IN THE SECURIAN FINANCIAL NETWORK TO ADVISE INSUREDS ABOUT IUL POLICIES AND CHARGED PLAINTIFFS AND THE CLASS FEES EMBEDDED IN THE POLICY PREMIUMS FOR FINANCIAL ADVISOR SERVICES. ......13

    E.   THE FIP ILLEGAL SCHEME ................................................................15

    F.   DEBTOR-SHURWEST'S PARTICIPATION IN THE FIP SCHEME HELPS THE SECURIAN DEFENDANTS' LIFE POLICY SALES ......15

    G.   DEBTOR-SHURWEST AND SECURIAN DEFENDANTS HAD ACTUAL AND CONSTRUCTIVE KNOWLEDGE OF THE FIP SCHEME AND PROFITED FROM THE FIP SCHEME ......19

VI.  CAUSES OF ACTION .......................................................................................22

VII. PRAYER FOR RELIEF .....................................................................................31

i

To The Court and All Parties In Interest:

Eleanor Ciofoletti, Rocco Ciofoletti, and Larry Stospal ("Plaintiffs"), Plaintiffs and Creditors of the above named Debtor, Shurwest LLC ("Shurwest," "Debtor-Shurwest," or "Debtor") on behalf of themselves and all others similarly situated, by their attorneys, Squitieri & Fearon, LLP, Wexler Elgersma & Boley LLP, Gustafson Gluek PLLC, and Zimmerman Reed LLP bring this Adversary Class Action Complaint pursuant to 11 U.S.C. 7001(1), (4)(6)(7)(8)(9) against Defendants Quantum Group USA, LLC ("Quantum") (as successor-in-interest to Debtor-Shurwest); ; Minnesota Life Insurance Company ("MLIC"); Securian Life Insurance Company ("SLIC") and Securian Financial Group, Inc. ("SFG"), based upon investigation of counsel and Plaintiffs' information and belief:

## I. **INTRODUCTION**

1.      This is an action on behalf of Plaintiffs and members of the proposed Class, defined below (the "Class"), who purchased MLIC or SLIC indexed universal life insurance policies ("IULs") issued through Defendant SFG life insurance subsidiaries' network of agents and brokers ("Securian" or the "Securian Financial Network") who were sponsored to become SLIC and/or MLIC agents by Debtor-Shurwest (the "Shurwest Broker Network" or "Shurwest") and for other relief under 11 U.S.C. 7001. Debtor-Shurwest and MLIC/SLIC had a principal-agent relationship through, *inter alia*, written agreements. Debtor-Shurwest, MLIC and SLIC were the principals of the brokers in the Shurwest Broker Network.

2.      Plaintiffs and the Class seek an award of money damages, as well as the imposition of a constructive trust and equitable lien, against all Defendants jointly and severally for participation in the Future Income Payments, LLC life insurance premium investment scheme (the "Scheme") which was shut down by the Federal Trade Commission in May or June of 2018.

3.      Debtor-Shurwest marketed and sold the MLIC and SLIC life insurance policies "linked to" (in Securian's own words) "structured cash flow" investment products from Future Income Payments, LLC (or its subsidiaries) ("FIP" and "FIP Products") to be purchased by Class members. The FIP Products were marketed by Debtor-Shurwest, through the Shurwest Broker Network, as a premium funding device to Class members to be purchased in combination

with the SLIC and MLIC IUL policies. Debtor-Shurwest procured the FIP Products for said brokers and agents to sell to Class members as part of Debtor-Shurwest's roles as a "Master Broker General Agent" and/or "Broker" of MLIC and SLIC.

4. FIP Products were notorious as early as 2015, when several State regulatory agencies investigated the FIP Products and determined them to constitute illegal usurious loans. Debtor-Shurwest, however, continued to market and offer FIP Products in conjunction with Securian IUL products through mid-2018, by which time over 20 states had determined that FIP Products were unlawful loan products and barred sales thereof within their respective states. When FIP ceased operations in mid-2018 as a result, Plaintiffs and the Class not only lost their investments in FIP Products, but also lost or were at risk of losing the life insurance policies purchased because, without the cash flows from the FIP Products, they could no longer pay for them or had to pay from sources other than the FIP Products.

5. Plaintiffs bring this action as a class action on behalf of themselves and all similarly affected purchasers of the IUL policies through the Shurwest Broker Network who purchased FIP Products linked to MLIC/SLIC IUL policies, to recover the millions of dollars in premiums paid, and for their losses in FIP Products.

## II. <u>JURISDICTION AND VENUE</u>

6. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 157, 1334, and 7001; this Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

7. Venue in this District is proper under 28 U.S.C. § 1409(a).

8. The claims arose in this District because Debtor-Shurwest conducted the *de facto* merger in this District. Debtor-Shurwest and Quantum are based in Arizona. As such, the unlawful conduct alleged herein originated in, and arose out of, this District. Venue in the District of Arizona is therefore proper pursuant to 28 U.S.C. § 1391(a) and (b) and 18 U.S.C. 1965(a) and (b).

9. This Adversary Proceeding relates to *In Re Shurwest LLC*, Case No. 21-bk-006723-D. Ariz. (DPC) now pending in this Court ("Bankruptcy Case"). Plaintiffs hold general unsecured claims against Debtor. Class members hold similar general unsecured claims against

Debtor-Shurwestbut have never received notice of the bankruptcy, the right to file claims or notice of deadlines; notice of a plan or ability to contest confirmation of the plan.

10. This Court has personal jurisdiction over Defendants because the cause of action arises out of or relates to acts or contacts by Shurwest Defendants, Quantum, and Securian Defendants in this State, and because of MLIC's consent to personal jurisdiction by filing a claim and other proceedings in the Bankruptcy Case.

### III. **PARTIES**

11. Plaintiffs Eleanor and Rocco Ciofoletti ("Ciofoletti") are residents of the State of South Carolina. In or about late 2016 the Ciofolettis' purchased an IUL from a "broker" in the Shurwest Broker Network who was also in Securian's own approved network of agents and brokers within the Securian Financial Network. As noted above, the brokers in the Shurwest Broker Network relevant to this class action were all also agents in the Securian Financial Network. In conjunction with the sale of the policy, the Ciofolettis' were solicited to purchase the FIP Product as a premium finance vehicle (which was actually an illegal investment product) promoted, offered, and sold by Debtor-Shurwest. The Ciofolettis have accepted MLIC's offer of rescission and return of premiums but they have not released any claims against Debtor-Shurwest or any other Defendant.

12. Plaintiff Larry Stospal ("Stospal") is a resident of the State of Texas. In or about late 2016 Stospal purchased an IUL from a broker in the Shurwest Broker Network who was also in Securian's own approved network of agents and brokers within the Securian Financial Network. In conjunction with the sale of the policy, Stospal was solicited to purchase the FIP Product as a premium finance vehicle (which was actually an illegal investment product) promoted, offered, and sold by Debtor-Shurwest. Stospal has accepted MLIC's offer of rescission and return of premium but has not released any claims against Debtor-Shurwest or any other Defendant.

13. Quantum is the successor-in-interest to Debtor-Shurwest by virtue of a *de facto* merger and/or alter ego having taken over all the operations of Debtor-Shurwest which is, for the present, the debtor in possession in the Bankruptcy Case. Quantum is therefore liable to

Plaintiffs and the Class under the doctrine of *de facto* merger and/or alter ego for the acts of Debtor-Shurwest. Quantum was created by Debtor-Shurwest's controlling persons to shift Debtor-Shurwest's operation and assets to Quantum and to attempt to allow Debtor-Shurwest to evade liability for its acts and obligations. Accordingly, Debtor-Shurwest's transfer of assets and operations to Quantum is a fraudulent transaction.

14.  Quantum is an Arizona limited liability company, doing business in Scottsdale, Arizona.

15.  On information and belief, Quantum's members are: Quantum Holding Company, Inc., an Arizona corporation with its principal place of business in Scottsdale, Arizona, KT Equity Partners III, LLC a Topeka, Kansas LLC whose members, on information and belief, are all citizens of Kansas, and RLS Capital Holdings, LLLP, a Nevada limited liability limited partnership whose general partner is Shurts Management Company, LLC, an Arizona LLC whose members are Ron Shurts, who resides in Scottsdale, Arizona and the Ronald L. Shurts Living Trust, which is located in Scottsdale, Arizona.

16.  Quantum was formed on November 12, 2018. Debtor-Shurwest began to rebrand itself as Quantum in February 2019. On information and belief, Quantum occupies the same office space as Debtor-Shurwest, employs the same employees as Debtor-Shurwest, is managed by the same directors and officers as Debtor-Shurwest, offers all of the services Debtor-Shurwest offers, and was set up as a successor entity to Debtor-Shurwest.

17.  Ron Shurts is a principal of both Debtor-Shurwest and Quantum, having been at times relevant the president of Debtor-Shurwest's and owner of Quantum.

18.  At all material times herein mentioned, Quantum was the alter ego of Debtor-Shurwest.

19.  Alternatively at all material times herein mentioned, Quantum was the successor-in-interest to Debtor-Shurwest and is liable for Debtor-Shurwest's wrongdoing through the equitable doctrine of *de facto* merger. Debtor-Shurwest's business continued as Quantum, with the same employees, directors, officers, business offices, telephones, and computers as Debtor-Shurwest used in its business dealings with Minnesota Life. Quantum's creation was a

fraudulent transaction, done in order to escape liability for Debtor-Shurwest's obligations.

20.     Debtor-Shurwest is an Arizona limited liability company. Debtor-Shurwest was at all relevant times a "Master Brokerage General Agent" and "Broker" pursuant to contracts with MLIC and SLIC throughout the Class Period.

21.     SFG is the parent company of MLIC and SLIC and provides insurance and investment services to businesses, individuals and its subsidiaries including financial advisory services. SFG owns and controls Securian Asset Management Inc., which provides investment advisory services for compensation. SFG also owns and controls Securian Financial Services, Inc. which is a registered broker-dealer and investment advisory affiliate.

22.     MLIC is a life insurance company which issued the IUL policies to Plaintiffs and all Class members except in New York State.

23.     SLIC is a life insurance company which issued IUL policies to all Class members who were located in New York at the time of purchase.

## IV.     CLASS ACTION ALLEGATIONS

24.     The action is brought and may properly be maintained as a class action pursuant to Rules 23(a), 23(b)(1)(b), (b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure.

25.     This suit is brought on behalf of a Class consisting of and defined as all persons who, between January 1, 2012 and the present, purchased an SLIC or MLIC IUL insurance policy in combination with a FIP Product(s) sold through the Shurwest Broker Network.

26.     Excluded from the Class are any member of the Securian Financial Network, Shurwest Broker Network and/or Quantum, any entity in which Quantum has a controlling interest, and the officers, directors, legal representatives, heirs, successors, subsidiaries and/or assigns of Defendants or Debtor-Shurwest.

27.     The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, are impractical. Plaintiffs are informed and believe that there are at least hundreds of proposed Class members geographically dispersed across the United States.

28.     MLIC has admitted in its lawsuit against Debtor-Shurwest that it has "identified

274 Minnesota Life IUL policies sold through Debtor-Shurwest between 2004 and early 2018 linked to an investment in FIP."

29.     The number of Class members who are not represented by other counsel and who have claims against Defendants are too numerous to be joined in this suit.

30.     There are numerous questions of law and fact common to Plaintiffs and the Class, including:

    a.  whether Debtor-Shurwest and/or SLIC, MLIC and/or SFG had fiduciary duties to the Class;

    b.  whether Debtor-Shurwest breached its fiduciary duties to the Class;

    c.  whether Quantum is liable for Debtor-Shurwest's breach of fiduciary duties to the Class;

    d.  whether SLIC and/or MLIC breached their fiduciary duties to the Class;

    e.  whether Debtor-Shurwest provided substantial assistance and thus aided and abetted Securian's breach of fiduciary duties to the Class;

    f.  whether Quantum is liable for Debtor-Shurwest's aiding and abetting SLIC and/or MLIC's breach of fiduciary duties to the Class; and

    g.  whether Debtor-Shurwest and Quantum acted to evade liability to creditors of Debtor-Shurwest through the fraudulent conveyance of assets.

31.     Plaintiffs' claims are typical of the claims of the members of the Class, and they are members of the Class they seek to represent.

32.     Plaintiffs are willing and prepared to serve the proposed Class in a representative capacity with all the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which conflict with, the interests of other members of the Class.

33.     Plaintiffs have engaged counsel who are experienced in complex class action litigation, will vigorously prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent Class members.

34.     The questions of law and fact common to the Class, as summarized above,

predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3).

35.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to hundreds of potential individual actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

36.     Rule 23(b)(1)(B) certification is appropriate because Debtor-Shurwest has limited funds.

37.     Rule 23(b)(2) certification is appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

38.     A class action is superior to other available methods for the adjudication of this controversy. Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more far more fair, efficient, and economical as a class action maintained in this forum than in piecemeal individual determinations.

39.     Plaintiffs initially sued all Defendants except Quantum in the United States District Court for Minnesota.  On August 12, 2021, Minnesota District Court Judge, the Honorable Joan N. Ericksen, denied Plaintiffs' motion for class certification for reasons that are remedied in this complaint.  Plaintiffs will be filing a renewed motion for class certification, which this Court is bound to treat as if it were an initial motion for class certification.  *Cf. Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3ʳᵈ Cir. 2020).

## V.     <u>SUBSTANTIVE ALLEGATIONS</u>

### A.     **Debtor-Shurwest's Role in the FIP Scheme**

40.     Debtor-Shurwest was a broker and "Master Brokerage General Agent" for both MLIC and SLIC pursuant to contracts with each. Debtor-Shurwest was, upon information and

belief, a member of the Securian Financial Network. Debtor-Shurwest marketed, promoted, and sold life insurance products and FIP Products to insureds through the Shurwest Broker Network and assisted and directed members of the Shurwest Broker Network in the marketing, promotion, and sale of life insurance policies and FIP Products.

41. Debtor-Shurwest also served as an Independent Marketing Organization ("IMO") to the Shurwest Broker Network. As one court explained the function of IMOs:

> Insurance companies generally do not recruit independent insurance agents to sell their products. Instead, IMOs recruit independent insurance agents to sell [fixed index annuities] and other types of insurance products to the independent agents' clients. An IMO serves as a third-party intermediary between the agents and the insurance companies, providing product education, marketing, and distribution services. Insurance companies generally compensate IMOs for their support services based on a percentage of agent sales volume.

*Mkt. Synergy Group, Inc. v. United States Dep't of Labor*, 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *3 (D. Kan. Nov. 28, 2016).

42. In its IMO role to *inter alia*, the Shurwest Broker Network, Shurwest promoted itself as follows:

> PROPRIETARY SOLUTIONS
> Shurwest gives you access to a complete array of insurance carriers offering the most advances . . . indexed universal life insurance strategies available today. By choosing us as your partner you also gain access to patented limited distribution solutions that set you apart from your competition.
>
> EDUCATION AND TRAINING
> - Webinars
> - Onsite visits to come to meet our team
> - Personal coaching
> - Peer to peer idea sharing

http:/shurwest.com/advisor-services# proprietary solutions last accessed November 4, 2019, 10:30 pm.

43. Under its agreements with SLIC and MLIC, Debtor-Shurwest was authorized to recommend to SLIC and MLIC "producers" who SLIC and/or MLIC should appoint to be MLIC and/or SLIC agents. These producers were also agents of Debtor-Shurwest and became part of the Shurwest Broker Network. Debtor-Shurwest was also authorized under broker and agent

AMENDED CLASS ACTION COMPLAINT

agreements with MLIC and SLIC to "provide service" to "product owners" of SLIC and MLIC "products." The services Debtor-Shurwest was allowed to provide under its agreements with MLIC/SLIC and which they provided to "product owners" through agents (*i.e.*, the Plaintiffs and Class members) included premium finance products and services. Debtor-Shurwest provided education, marketing, and distribution services to both agents and brokers regarding IUL products and how to use FIP Products in combination therewith. When insurance brokers and/or financial advisers who used Debtor-Shurwest's services sold MLIC/SLIC IUL policies, they paid a portion of the commissions to Debtor-Shurwest pursuant to the agreements. Likewise, when Debtor-Shurwest employees sold FIP Products they received commissions from FIP.

44.     Under the Master Brokerage General Agent ("MBGA") Agreements with MLIC and SLIC, Debtor-Shurwest contracted to perform "the following activities" (in relevant part): 1.2 . . .

> (a) Supervise, insofar as possible, Your Brokers to ensure that they:
>
> * * *
>
> 4.     Comply with all applicable insurance laws and regulations governing the sales and servicing of our products
>
> * * *
>
> (b) Review all applications before submitting them to US . . . and submit only those applications that have been properly completed. . .
>
> 4.11   Anti-Money/Laundering:     You shall comply and require your brokers to comply with our anti-money laundering policy and if requested You and Your Brokers shall assist in satisfying Our     obligations under   our   anti-money laundering policy.

45.     Debtor-Shurwest also entered into Broker Sales Contracts with each of MLIC and SLIC.

46.     Debtor-Shurwest at all times acted within the scope of the agent and broker agreements referred to above with the actual or apparent authority of Securian, and its actions relative to the FIP Products described below were known or should have been known to Securian.

**B.     Quantum Is Debtor-Shurwest's Alter Ego/Successor-In-Interest**

47.     On September 12, 2018, Articles of Incorporation were filed with the Arizona Corporation Commission on behalf of a new entity, The Quantum Group, USA, LLC, Quantum and Debtor-Shurwest are controlled by the same people and entities. Jim Maschek was the statutory agent and organizer of Quantum and the address for both he and Quantum was 17550 N. Perimeter Driver, Suite 300, Scottsdale, AZ, 85255 (*Id*.), same as Debtor-Shurwest.

48.     On October 2, 2018, Debtor-Shurwest filed a Trademark/Service Mark Application with the United States Patent and Trademark Office for the "The Quantum Group" mark. Around the same time, Debtor-Shurwest registered for the domain name "thequantumgroup.com." A Quantum Facebook page was also created in October 2018.

49.     A few months after The Quantum Group was formed, Debtor-Shurwest began "rebranding" itself as Quantum. In February 2019, a representative from MLIC called and learned that "Shurwest is rebranding the firm as Quantum." The Securian representative then e-mailed several colleagues "so that there is no confusion as to who Quantum is" and said that "they just started to answer the phones this way today and are just beginning to roll out the changes."

50.     A month later, Ron Shurts referred to Shurwest/Quantum as a single entity in an e-mail with Securian about establishing a fund to deal with Minnesota Life chargebacks. Shurts copied Debtor-Shurwest Controller Tony Avalos on the e-mail at Mr. Avalos' shurwest.com e-mail address. Mr. Avalos is the Financial Controller at Quantum and in the very same e-mail thread, his e-mail address changes from tavalos@shurwest.com to tavalos@thequantum.com, although this email signature still identified him as Shurwest's Controller. *Id*. The same month,

Marc Lindsay, the VP of Advisor Development, e-mailed a Shurwest client **"ANNOUNCING. . .SOMETHING BIG."** (Emphasis in original). The big announcement WAS: "[i]t's official we are now Quantum" and the "rebrand is almost complete." *Id.*

51.     Debtor-Shurwest and Quantum's ownership and management are substantially the same. Debtor-Shurwest and Quantum both count James Maschek, RLS Capital Holdings, LLP, KT Equity Partners III, LLC, and Nexus Horizon, LLC as managers or members. And, as noted above, Ron Shurts was Debtor-Shurwest's President and Quantum's owner.

52.     Quantum conducts the same business that Debtor-Shurwest did in the past, with the same employees, office, phone number, back-office staff, and customer relationship software as Debtor-Shurwest.

53.     On March 10, 2019, Ron Shurts, referred to Shurwest/Quantum as a "single entity" in an email with Securian about establishing a fund to repay Minnesota Life chargebacks.

54.     Erin Flores from Advantage Insurance e-mailed Dee Spence at Protective Life Corporation in April 2019, stating that "Shurwest and Quantum are the same agency, however there are separate tax IDs for each Entity. Shurwest would like the BGA appointment held under AIN to be under Quantum's name -and all downline currently staged under Shurwest to be transferred to under Quantum."

55.     Quantum is Debtor-Shurwest's new name.

56.     Debtor-Shurwest re-branding itself as Quantum is underscored by how Debtor-Shurwest's business fell precisely when Quantum's rose. As shown in Debtor-Shurwest's Petition [Doc. l] ("Petition"), Debtor-Shurwest's annual gross revenue was $21.1 million in 2018, and sharply declined to $7.5 million in 2019 (when Quantum became operational), followed by a steeper downfall to $3.04 million in 2020. Petition at PDF pgs. 12 (2020 Form 8879-PE), 42 (2019 Form 8879-PE), & 70 (footnotes to 2019 Schedule K-1).

57.     In addition to forming Quantum and rebranding itself as Quantum, Debtor-Shurwest also transferred substantial tangible and intangible assets to Quantum or for Quantum's benefit thus leaving Debtor-Shurwest insolvent and constituting a fraudulent

conveyance of assets to defeat creditors. There are no filings in the bankruptcy proceedings which show that Quantum paid any consideration for these asset transfers.

58.     The assets that Debtor-Shurwest transferred to Quantum or for Quantum's benefit include valuable license, agent agreements, customer contracts, and all or nearly all the fin-tech systems. It appears that Quantum has never had its own employees. Instead, all, or nearly all, the people that have performed work for Quantum, were employed by Debtor-Shurwest when Quantum was formed.

59.     Debtor-Shurwest also apparently transferred to Quantum its contractual rights and authority with other insurers, as well as agents in Debtor-Shurwest's downline who were appointed by those insurers.

60.     Debtor-Shurwest executed a Trademark Assignment that assigned "the entire business to which the Trademark Rights pertain, including all right, title and interest in and to the trademarks together with the goodwill of the business connected with and symbolized by the trademarks." There is no indication or evidence that Quantum paid any consideration to Debtor-Shurwest for this assignment.

61.     Prior to the formation of Quantum, Debtor-Shurwest apparently offered website hosting services to agents and their firms and billed them monthly for those services. In August 2019, Farmer and Associates received an e-mail that explained, because of the "operational ramp up of Quantum," the firm had to provide a new credit card authorization so that Quantum could bill for automatic monthly website hosting payments that were originally set up with Debtor-Shurwest. There is no evidence that Debtor-Shurwest received any consideration for transferring those assets to Quantum. The very same e-mail claimed that Quantum was "2017 & 2018 Best Distributor Award Winner-SRP Awards" even though Quantum did not exist before November 2018.

### C.     The Shurwest Broker Network

62.     At all times relevant, the indexed life insurance policies were sold by MLIC and SLIC through "advisors" in the Shurwest Broker Network, who were also in the Securian Financial Network.

ADVERSARY CLASS ACTION COMPLAINT

63. Securian Defendants have publicly stated: "Securian Financial Network, the marketing name for the sales and distribution arm of Securian Financial Group, Inc., its subsidiaries and affiliates, is a nationwide network of financial services firms. Products and services are offered and sold only by appropriately licensed entities and financial representatives." Securian touted the Securian Financial Network as a "long-term resource to provide expertise and create strategies to help you and your family achieve your financial goals." Its advisors "support your everyday moments and major milestones and approach your finances from a holistic standpoint." According to the Securian website, an advisor in the Securian Financial Network:

- listens to your goals, visions, dreams – and even your fears

- analyzes financial resources and opportunities

- devises a roadmap to help you reach your goals

64. Securian further represented in its website:
At Securian Financial, we equip our financial advisors with suitable choices to serve clients and their unique situations. Our advisors offer a range of life insurance, annuities and wealth management solutions to help you put family first.

* * *

With access to a network of more than 1,100 registered financial advisors, building your secure tomorrow is just a click away.

65. Securian also, on its website, also boasted: "[we] serve nearly 19 million customers through 5300 employees and representatives."

**D.     MLIC and/or SLIC Were Fiduciaries to Plaintiffs and Class Members Because They Used "Financial Advisors" in the Securian Financial Network to Advise Insureds About IUL Policies and Charged Plaintiffs and the Class Fees Embedded in the Policy Premiums for Financial Advisor Services.**

66. During the period relevant to this complaint, SFG's website page entitled "Universal Life Insurance" (securian.com/products-services/life-insurance/universal-life-insurance.html (As of 10:24 a.m. cst.11/6/2019) acknowledged that its IUL products were

complicated financial instruments for which insureds would require the services of financial advisors. It stated:

> Types of universal life insurance. What type is right for you? If you and your financial advisor determine universal life insurance is a good choice, Securian offers three variations to choose from – fixed, indexed and variable.
>
> The main difference between the products is the risk/return associated with their cash value growth potential. When choosing the ideal product for your needs, you and your advisor should consider your level of risk tolerance.

67.    In its website page specifically referencing "Indexed universal life," SFG invited visitors to "Ask a professional." "A financial advisor can help you analyze your needs and help you choose the insurance that's rights for you." The site contained a "live" box labeled, "Find an advisor," which when clicked directed a visitor to a member of the Securian Financial Network who, as relevant to Class members here, was also a member of the Shurwest Broker Network.

68.    The Securian Defendants employed financial professionals who determined and oversaw investment allocations and returns for IUL policyholders. The costs of those professionals were paid in part from fees embedded in premiums paid by policyholders. The Securian Defendants thus earned revenues from providing financial services to Plaintiffs and Class members as did Debtor-Shurwest.

69.    IUL policies such as those which are the subject of this action are complex financial instruments as described on the website of one of Debtor-Shurwest's affiliates, Annexus:

### What is IUL?

> Indexed Universal Life Insurance is a form of permanent life insurance that provides a tax-free death benefit upon your death. It also offers tax-advantaged cash value growth you can access throughout your life. Your cash value earns interest based on the positive performance of an underlying stock market index like the S&P 500. Interest would be credited at the end of an index segment (or term), with common segments of a 1-year, 2-years or up to 5-

years. If the index performance is negative during any segment, your cash value is protected from any negative market return.

70.     Similarly, Securian described IUL products as follows:
**Balancing risk and cash value growth**

Indexed universal life insurance offers cash value growth that is tied to the movement of an underlying index but does not participate in the market.

Minimum and maximum interest crediting limits act as guardrails, which make indexed universal life less risky than variable universal life insurance, while potentially producing greater interest crediting than fixed universal life insurance.

71.     Not surprisingly, in its website page, the Securian Defendants invited, encouraged, and facilitated insureds' use of Securian Financial Network financial advisers in the purchase of IUL policies as alleged in more detail hereinafter.

**E.      The FIP Illegal Scheme**

72.     FIP Products were agreements through which FIP provided monthly income streams sold to "investors" such as Plaintiffs and Class members.

73.     FIP Products were, in fact, illegal products. By 2015, both New York and California had barred FIP Products from sale to their respective state residents. FIP misrepresented material aspects of the purchase transactions and engaged in deceptive acts and practices as well as other violations of federal consumer financial law, leading to its shutdown and placement in receivership.

**F.      Debtor-Shurwest's Participation in the FIP Scheme Helps the Securian Defendants' Life Policy Sales**

74.     FIP Products were sold to Class members by financial advisors in the Shurwest Broker Network and its employees. See generally, *Bureau of Consumer Financial Protection v. Future Income Payments, LLC et al.* (C.D. Cal.), Case No. 8:18-cv-01654, Complaint ¶ 45.

75.     To offer MLIC and SLIC life insurance policies financed by FIP Products, Shurwest Broker Network brokers and agents signed broker agreements with MLIC or SLIC

wherein Debtor-Shurwest was the Master Broker Agent. Among other things, those agreements required the agents and brokers to remit policy applications and initial premiums to Debtor-Shurwest, which in turn reviewed the applications, processed information and forwarded them to MLIC and/or SLIC. At all relevant times, Shurwest Broker Network acted within the scope their respective agency agreements with Debtor-Shurwest and MLIC and/or SLIC, with the actual or apparent authority of both Debtor-Shurwest and Securian.

76. Under its own practices and policies, Securian Defendants allowed only brokers under contract to MLIC or SLIC to market and offer IUL products to insureds.

77. Debtor-Shurwest marketed the FIP Products to its Shurwest Broker Network, who were also MLIC and SLIC brokers, at conferences, webinars and face to face meetings to be sold in combination with Securian's IUL Policies. In its capacity as SLIC and/or MLICs agent and/or broker, Debtor-Shurwest marketed FIP Products as investment products available for brokers to sell to Plaintiffs and Class members in combination with SLIC and/or MLIC IUL policies.

78. When Debtor-Shurwest began to sell FIP Products in or about early 2016, it was just a continuation of Debtor-Shurwest's "IRA Reboot Strategy" which Debtor-Shurwest had marketed since at least early 2014, a "strategy" which involved use of an insurance client/s IRA assets to pay insurance premiums on policies sold by the Shurwest Broker Network. The FIP premium funding strategy (IRA Reboot with FIP) Debtor-Shurwest pitched to Shurwest-affiliated agents involved converting taxable assets to a tax advantaged vehicle over a period of time, by "turbocharging" the IUL product through the use of a "structured cash flow" in order to facilitate a more aggressive funding strategy.

79. Debtor-Shurwest's National Sales Director of Life Insurance, employee Melanie Schultz-Miller, immediately recognized the profit potential to Debtor-Shurwest. Miller, in an email to Shurwest's President on April 6, 2016, wrote about using FIP Product to fund a life policy: "So…better for us, . . . and it actually creates a larger life [policy] because the premiums are even higher (so extra better for us)."

80. Miller and her employer Debtor-Shurwest promoted and trained the Shurwest Broker Network in the use of the FIP structured cash flow products. Debtor-Shurwest distributed to the Shurwest Broker Network a "structured Cash Flow Order of Operations."

81. A California Superior Court Judge after hearing evidence about Debtor-Shurwest's "rogue employee" defense (that Debtor-Shurwest was not responsible for the actions of Miller), made the following findings:

> Shurwest accepted the use of FIP as an alternative funding service provider, FIP did not compete with the products and services provided by Shurwest. Shurwest benefited from FIP's facilitating the funding of life insurance policies on which Shurwest received a commission. (Wolf Dec. Ex.9 51-53). From the facts before the Court, it is clear that Shurwest directed activities related to its "Retirement Reboot" program to California, that Shurwest was aware that its agents were recommending FIP as a funding mechanism for the IUL policy recommended the Retirement Reboot program, that the purpose of using the FIP as a funding mechanism (rather than direct funding) was to purchase the IUL at higher levels, and that Shurwest received commissions from the IUL purchases and benefited from the increased funding levels provided by the FIP, The evidence put on by Shurwest to suggest that Mr. Seabolt and Ms. Shulze-Miller were rogue employees operating without Shurwest's knowledge or sanction is simply not credible in light of the overwhelming evidence that Shurwest was aware of the use of FIP to fund higher levels of IUL, that its employees did so as part of their employment with Shurwest (via Shurwest email, with Shurwest resources and training at Shurwest in AZ), and that Shurwest ultimately profited off those increased IUL amounts via commission. Similarly Shurwest's characterization of its' company emails being used to send information related to the Retirement Reboot and FIP funding as "inadvertent" strikes false in light of the sheer volume of correspondence being sent to multiple California Agents.

*Leland v. Brown*, Case No. CV 1900627 (June 24, 2020, Cal. Sup. Ct., Marin Cnty. Order Denying Defendant Shurwest LLC's Motion To Quash Service of Summons for lack of Personal Jurisdiction."[1]

82. The IRA Reboot plus FIP Product sales was a spectacular sales success for Debtor-Shurwest: in 2017, its revenues grew almost 7% from 2016; in 2018 Debtor-Shurwest's revenue

---

[1]    Other courts have determined that this situation was not of a "rouge" employee. *See Order Denying Shurwest, LLC's Motion to Dismiss, Billings, et al. v. Dixon, et al.*, Case No. 2019-CP-04-00479, *See Order Denying Shurwest, LLC's Motion to Dismiss, Burgess v. Storer, et al.*, Case No. 2018-CP-23-04197; *See Order Denying Shurwest, LLC's Motion to Dismiss, Stegelin, et al. v. Dixon, et al.*, Case No. 2019-CP-40-00507.

grew to $21.1 million an almost 40% increase from 2015, phenomenal growth considering that Debtor-Shurwest's FIP business came to a screeching halt in April 2018 when FIP collapsed.

83. Debtor-Shurwest employees introduced brokers/advisers, including the Shurwest Broker Network to the FIP Products during meetings at the Debtor-Shurwest's corporate headquarters and/or conferences held nearby. At these events, Debtor-Shurwest specifically pitched the FIP Products to agents, brokers, and employees as a means of funding life insurance policies issued by Securian. The Debtor-Shurwest employees conducting these meetings and otherwise pitching FIP Products in conjunction with the sale of the Securian's life insurance policies, were at all times acting within the scope of their employment with Debtor-Shurwest, with the actual or apparent authority of Debtor-Shurwest, and their actions relative to the FIP Products were known or should have been known to Debtor-Shurwest.

84. Debtor-Shurwest employees recommended and facilitated the use of the FIP Products as premium financing vehicles as safe and reliable products that would provide a consistent stream of income that would fund the payment of the Securian life insurance policies.

85. One of the conferences sponsored by Debtor-Shurwest took place in early March 2017. At that conference, Debtor-Shurwest marketed the use of FIP Products to fund the purchase of MLIC and SLIC universal life insurance policies.

86. Debtor-Shurwest employees trained the Shurwest Broker Network agents who were also part of the Securian Financial Network on the FIP premium funding strategy—specifically, on the use of FIP "structured cash flows" in conjunction with MLIC/SLIC IUL policies— and provided them with webinars and sales materials to help present the strategy to clients.

87. Debtor-Shurwest communicated with and directed Shurwest Broker Network agents and brokers in effectuating the transactions, and vetted applications to MLIC and/or SLIC including Plaintiffs' and Class members' premium payments for the insurance policies in connection with those transactions.

88. The Shurwest Broker Network agents and brokers sold FIP Products to Plaintiffs and the Class to finance the premiums for life insurance policies issued by MLIC/SLIC and

structured the sales so that the payment stream from the FIP would be used to pay Securian for the life insurance policies.

89. According to published reports, approximately 370 financial advisors in the Shurwest Broker Network put their clients in FIP Products and steered those clients to utilize the FIP monthly payments to fund insurance products such as the IUL policies.

90. In or about April 2018, FIP ceased making payments to income stream purchasers, i.e., Plaintiffs and Class members. As a result, Plaintiffs and the Class could no longer fund the life insurance policies sold to them by Debtor-Shurwest. Consequently, Plaintiffs and other Class members suffered the lapse of their policies, incurred surrender charges and other penalties, and had paid for policies which never accumulated enough value to provide the Plaintiffs and Class members with a source of retirement income, the objective of the life insurance policy purchase. At the same time, Plaintiffs and Class members lost whatever they had paid to FIP, which was supposed to – but did not -- yield a steady stream of cash flows that would have funded the life insurance now lapsed.

### G. Debtor-Shurwest and Securian Defendants Had Actual and Constructive Knowledge of the FIP Scheme and Profited From the FIP Scheme

91. Debtor-Shurwest, MLIC and SLIC had actual and constructive knowledge of the illegal FIP loan scheme.

92. Debtor-Shurwest claimed it had vetted the FIP Products, and it was also responsible for structuring the FIP Products and facilitating the use of the FIP Products for the purchase of Securian life insurance policies.

93. Furthermore, Securian Defendants knew or should have known of FIP's illegal loan scheme through the presence of Securian Defendants high-ranking employees at Debtor-Shurwest events promoting the FIP-scheme as a means of funding life insurance premiums, as well as through reports of actions by state regulatory agencies' enforcement actions against FIP and its convicted felon founder Scott Kohn.

94. In 2016, MLIC/SLIC's National Sales Director, Louis G. Slagle, participated in a marketing and promotion event by AMZ Financial Insurance Services LLC f/k/a AMZ

Insurance Agency LLC also doing business as Partners Advantage Insurance Services which was an important marketer of MLIC/SLIC IUL policies in 2015-2018. The event included two days of presentations by, *inter alia*, Louis Slagle for Minnesota Life and a representative of FIP to speak on "structured cash flow." At the end of each day's presentations time was set aside for "Sponsor and Agent Mingling." Both FIP and MLIC were listed as "Sponsors" on the event's agenda.

95. In addition, Securian had a legal obligation under the USA Patriot Act and/or the Bank Secrecy Act to be aware that the Shurwest Broker Network was utilizing the FIP illegal loan scheme to finance the purchase of life insurance policies issued by Securian. Finally, Securian and Debtor-Shurwest had ample opportunity and ability to bar agents and brokers from using the FIP illegal loan scheme to finance life insurance policy purchases by Plaintiffs and Class members.

96. FIP has been the subject of state regulatory investigations since 2014, with various states including New York, alleging that FIP's business model was an illegal scheme.

97. Numerous other state and local regulators and agencies also have ordered FIP to cease its operations. These agencies include the California Department of Business Oversight; the Los Angeles City Attorney's Office; the Minnesota Attorney General; the Colorado Attorney General; the Massachusetts Attorney General; the North Carolina Attorney General; the Iowa Attorney General; the Virginia Attorney General; the Oregon Attorney General; the Oregon Department of Consumer and Business Services; the Illinois Attorney General; the Illinois Department of Financial and Professional Regulation; the Maryland Attorney General; the Maryland Commissioner of Financial Regulation; the Pennsylvania Department of Banking and Securities; the New York State Department of Financial Services; and the State of Washington Department of Financial Institutions.

98. In mid-2017, Minnesota Attorney General Lori Swanson filed a lawsuit against FIP and a subsidiary alleging that FIP was making illegal loans disguised as purchases of pensions which obligated the borrowers ("sellers" of pension rights) to repay the loans, termed "purchases," at effective rates of 240% and at average rates of 139% annually.

1
2
3
4
5
6
7
8
9

99.     Securian Defendants' also would have acquired knowledge of FIP illegal activities through Securian Defendant's procedures to ensure compliance with various federal anti-money laundering rules and regulations. Insurers who issue "covered products" such as Securian are subject to compliance and reporting requirements of the USA Patriot Act. The "covered products" include life insurance products with cash value or investment features and/or non-group annuity contracts. Under these regulations, each insurance company must develop and implement a risk-based anti-money laundering ("AML") policy reasonably designed to prevent the company from being used to facilitate money laundering "and other financial crimes associated with the insurance company's products."

10
11
12

100.    The scope and objective of these AML laws is not limited to money laundering or terrorist financing only. In or about 2005, Director of Financial Crimes Enforcement Network ("FinCEN") William J. Fox announced:

13
14

These rules represent key steps in ensuring that the Bank Secrecy Act is applied appropriately to these businesses and in protecting the insurance industry from potential abuse by those seeking to launder money or finance terrorism or other illicit activity.

15
16
17
18
19
20

101.    Also, according to regulators, the insurer's AML program must encompass the activities of agents or brokers who sell "covered products" because "insurance agents and` brokers are an integral part of the insurance industry due to their direct contact with customers" and therefore the insurer's AML "policies, procedures and internal controls" must be designed "to integrate its agents and brokers into its anti-money laundering program and to monitor their performance with its program."

21
22
23

102.    SLIC and MLIC agent and broker contracts with Debtor-Shurwest required Debtor-Shurwest to comply with AML Laws and to assist MLIC and SLIC's compliance therewith.

24
25
26
27
28

103.    In early 2012, FinCEN and the National Association of Insurance Commissioners ("NAIC") reached an agreement to incorporate the initial BSA/AML examination within the regulatory examinations performed by the Department of Insurance of each company's

domiciliary state. NAIC Financial Condition Examination Handbook 2012, Section 1.c., pp. 98–101.

104.    The United States Treasury Department's "bottom line" was explained in its "Frequently Asked Questions," Anti Money Laundering Program And Suspicious Activity Reporting Requirements For Insurance Companies":

> Under the Bank Secrecy Act, financial institutions are required to identify
> assess, and mitigate risk that their businesses will be abused by criminals.

105.    Accordingly, MLIC and SLIC were legally mandated to monitor their own activities as well as those of the Shurwest Broker Network to prevent FIP's and broker/agent's promotion of financial crimes utilizing Defendants' products.

106.    Although Securian Defendants and Debtor-Shurwest had actual and constructive knowledge of the illegal FIP loan scheme, Debtor-Shurwest falsely represented that FIP Products were appropriate for the insureds who were purchasing MLIC/SLIC IUL products. Securian Defendants explicitly or implicitly granted Debtor-Shurwest authority to promote FIP Products as a premium financing vehicle for MILC and SLIC IUL policies. Securian Defendants did so by attending and participating in Debtor-Shurwest orchestrated webinars and conferences at which (a) FIP Products were promoted and (b) Securian's Defendants representatives spoke about premium financing vehicles and advantages of using insured's assets to pay policy premiums.

## VI.    CAUSES OF ACTION

### COUNT I

### COMMON LAW FRAUD BY OMITTING MATERIAL FACTS AGAINST DEBTOR-SHURWEST FOR PARTICIPATION IN THE FIP SCHEME

107.    Plaintiffs repeat and reallege each and every allegation previously set forth herein.

108.    Plaintiffs bring this fraud claim against Debtor-Shurwest for its participation in the FIP scheme and for its fraudulent omissions of material facts regarding FIP and FIP Products in communications to Plaintiffs and the Class through Debtor-Shurwest agents in the Shurwest Broker Network at the time that Shurwest Broker Network were selling FIP Products to

Plaintiffs and Class members in connection with, and as a premium funding method for, the sales of MLIC and SLIC IUL insurance products.

109. These claims are timely brought under Arizona law and/or the laws of the states in which the policies were sold in light of Debtor-Shurwest's active concealment of its participation in the FIP Product fraud which was "discovered," for statute of limitations purposes, at the earliest in April 2021 when a former officer of Debtor-Shurwest, Melanie Shulze-Miller, swore under oath with factual details that Debtor-Shurwest itself was a direct participant in the scheme to sell the FIP Products. The statute of limitations has also been tolled by Debtor-Shurwest's bankruptcy filing.

110. Debtor-Shurwest profited from its participation in the FIP scheme and its fraudulent omissions of material facts about FIP Products in two ways: Debtor-Shurwest employees were paid commissions on FIP Products sold and Debtor-Shurwest itself received commissions from SLIC/MLIC on IUL policies sold which were financed with FIP Products.

111. Debtor-Shurwest profited in an additional way. The FIP Products that were embedded in Debtor-Shurwest's "IRA Reboot" sales, marketing, and premium financing investment strategy gave Debtor-Shurwest the ability to sell much larger IUL policies to Plaintiffs and Class members which, in turn, generated much larger commissions for Debtor-Shurwest.

112. At the time Debtor-Shurwest was training its brokers and agents to sell MLIC/SLIC policies using FIP Products as premium financing products, Debtor-Shurwest knew but failed to disclose, that several states had started regulatory actions to prevent FIP from operating in their states because the FIP Products were illegal products. Debtor-Shurwest failed to disclose that it was submitting applications to SLIC/MLIC using "structured cash flow" products (i.e., the FIP Products) to finance IUL policy premiums, which was against MLIC/SLIC stated policies but which MLIC/SLIC and SFG temporarily ignored to enjoy earning higher premiums.

## COUNT II

## AGAINST DEBTOR-SHURWEST UNDER ARIZONA'S CONSUMER
## FRAUD ACT FOR COMPENSATORY AND PUNITIVE DAMAGES

113.    Plaintiffs repeat and reallege here each and every allegation previously set forth herein.

114.    Plaintiffs bring this claim under Arizona's Consumer Fraud Act ("A.R.S.") 44-1521 et seq, which prohibits "the act, use or employment by a person of any deception, deceptive or unfair act or practice, fraud, false pretense, false premise, misrepresentation or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission in connection with the sale or advertising of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby" ID. At 1552(A).

115.    The IUL policies constitute "merchandise" under ARS 44-1521(5) which includes "any objects, wares, goods, commodities, intangibles, real estate or services".

116.    A private right of action under the Act exists under Arizona Law *Selliyer v. Freeway Mobile Home Sales, Inc*. 110Ariz, 573, 575-76, 521 P2D 1119, 1121-22 (1974).

117.    Debtor-Shurwest's conduct was wanton and/or reckless and/or was with reckless indifference to the interests of Plaintiffs and other Class members.

118.    This action was brought within one year of the accrual of the cause of action upon discovery in April 2021 of Debtor-Shurwest's participation in the FIP scheme. The statute of limitations was tolled in August 2021 by Debtor-Shurwest's bankruptcy.

119.    Debtor-Shurwest also violated the Act by committing violations of state and federal securities regulations by selling FIP Products even though such products were investment products which Debtor-Shurwest was not legally permitted to sell to Plaintiffs and Class members.

120.    As a result of the foregoing, Debtor-Shurwest caused Plaintiffs and Class members' loss and damages and is liable to Plaintiffs and the Class for such loss and damages, as well as punitive damages.

121.    Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

122.    Securian Defendants were fiduciaries to Plaintiffs and Class members.

123.    During the relevant period, Securian promoted itself and its Network as "financial advisors" which offered financial advice to clients in connection with the sale of MLIC and SLIC policies. These financial advisors, promoted by Securian as part of its financial network, sold to Plaintiffs and the Class MLIC and SLIC IUL policies financed by the FIP investment – an investment only available through Debtor-Shurwest. These transactions were not simply sales of life insurance.  The MLIC and SLIC IUL policies were sold with the FIP investment as part of a purported financial planning vehicle.  Securian received compensation for its financial services and financial advisor's financial advice in selling these FIP funded IUL policies. As discussed above, part of the Plaintiffs' and Class Members' premium payments paid the costs associated with Securian's financial advisory services and thus Securian received compensation for providing financial advisory services to purchasers of IUL policies including Plaintiffs and the Class.

124.    As a result of Plaintiffs' and the Class's payment to Securian for its financial services, and Securian's superior knowledge, skill and resources, Securian was a fiduciary to Plaintiffs and the Class under Minnesota law.

125.    Among the fiduciary duties owed to Plaintiffs and the Class were duties to: avoid conflicts of interests with Plaintiffs and Class members; resolve conflicts in favor of Plaintiffs and Class members where conflicts arose; to always act in the best interest of Plaintiffs and the Class; to make full, fair, and accurate disclosure of all facts material to the relationship and transactions with Plaintiffs and the Class.

126.    Securian had a duty to avoid facilitating a Ponzi scheme by FIP and Debtor-Shurwest by allowing Plaintiffs and Class members to purchase MLIC an SLIC IULs using FIP Products to pay premiums.

127.    Securian had an affirmative duty to Plaintiffs and members of the Class not to sell, or allow its agents to sell, to Plaintiffs and Class members the illegal FIP Products.

128.    Securian violated its duties to Plaintiffs and the Class by allowing such sales, including allowing such FIP Product sales to fund greater amounts of life insurance from the Securian Defendants.

129.    Securian was required by law to have procedures in place to ensure compliance with AML and BSA laws both for itself and to impose such procedures upon its agents and brokers to prevent the sale of Plaintiffs and Class members of the illegal FIP Products.

130.    These regulatory imperatives which were placed upon Securian resulted in Securian's knowledge (if proper compliance procedures were implemented and followed) regarding the illegal FIP Products that were being offered in conjunction with SLIC and MLIC products and which were being used as premium funding vehicles.

131.    Securian had actual or constructive knowledge of the illegal FIP loan scheme and knew they were reaping consistent and unlawful profits from the scheme at the expense of Plaintiffs and the Class.

132.    Securian's acts and omissions constitute a breach of its fiduciary duties to Plaintiffs and the Class.

133.    Securian's fiduciary breaches and participation in Debtor-Shurwest's promotion and sale of FIP Products was a proximate cause of the Plaintiffs and Class members' damages.

## COUNT IV

## AGAINST DEBTOR-SHURWEST FOR AIDING

## AND ABETTING SECURIAN DEFENDANTS' FIDUCIARY BREACHES

134.    Debtor-Shurwest provided substantial, knowing assistance to Securian in its breach of fiduciary duties.

135.    Debtor-Shurwest recruited and solicited financial advisors to utilize Debtor-Shurwest services and its insurance broker and agent facilities with Securian and recommended financial advisers to be appointed as Securian insurance agents pursuant to the Master Brokerage

General Agency Agreements between Debtor-Shurwest and MLIC and SLIC.

136. Debtor-Shurwest undertook to market to and educate Network Agents on how to influence Plaintiffs and Class members regarding the purchase of FIP Products as a means of paying premiums for insurance issued by MLIC and SLIC. Debtor-Shurwest received compensation for its financial services with respect to each Class members' FIP linked IUL policies.

137. Debtor-Shurwest intended to influence and induce Plaintiffs and the Class through its education of Network Agents.

138. Debtor-Shurwest, through its officers, employees, and agents aided and abetted the fiduciary breaches committed by the Securian Defendants against the Plaintiffs and Class members in numerous ways, including, without limitation, failing to properly vet the FIP Products while claiming that it had done so; failing to supervise its employees and/or agents regarding the sale of FIP Products; failing to disclose material facts about the FIP Products to Plaintiffs, Class members, Network Agents, and other broker/agents, including that the FIP Products were part of an illegal scheme; failing to disclose at relevant times that the FIP Products were deteriorating as "investments" and could no longer sustain the premium payments on Plaintiffs' and Class members' life insurance policies; continuing to structure, market, and facilitate the sale of FIP Products to finance Plaintiffs and Class members' life insurance policies despite knowledge that the FIP Products were part of an illegal loan scheme; and acting in bad faith, with negligence, gross negligence, willful misconduct, and/or reckless disregard of its duties.

139. Securian was in a fiduciary relationship with Plaintiffs and the Class and were in a superior position over the Class which required Class members to repose trust and confidence in the Network Agents who were operating on Securian's behalf.

140. Debtor-Shurwest knew that Securian had fiduciary duties to Class members and knowingly participated in the breach of those duties, rendering substantial assistance and causing harm to Plaintiffs and the Class.

141.   Specifically, as the agent for Securian, Debtor-Shurwest educated and marketed to the Network Agents the FIP Products as a legal and appropriate way for clients of the agents and brokers to finance the purchase of Securian life insurance policies. The agents and brokers looked to Debtor-Shurwest, an IMO, for product education, marketing, and distribution services with regard to the Securian life insurance policies and the information provided by Debtor-Shurwest aided and abetted breaches of Securian fiduciary duties by promoting the sale of illegal FIP Products in conjunction with Securian life insurance policies.

142.   At all times, Debtor-Shurwest was the agent for Securian, and thus Debtor-Shurwest participated in, and provided substantial assistance to, Securian's breaches.

143.   Debtor-Shurwest's assistance was a proximate cause of Securian's breach of its fiduciary duties. Without Debtor-Shurwest's assistance, the Debtor-Shurwest Broker Network would not have even known to sell the FIP Products in conjunction with Securian life insurance policies, much less promote them as a legitimate vehicle for financing premiums.

144.   As a result of Debtor-Shurwest's aiding and abetting Securian's breach of its fiduciary duties, Class members lost millions of dollars.

## COUNT V

### AGAINST QUANTUM AS SHURWEST'S SUCCESSOR IN INTEREST AND/OR ALTER EGO FOR LIABILITY UNDER COUNTS I, II AND IV

145.   In February 2019, Debtor-Shurwest began rebranding itself as Quantum. Debtor-Shurwest employees' email signatures included references to Quantum, Debtor-Shurwest employees answered the phone on Quantum's behalf, and Debtor-Shurwest President and Quantum owner Ron Shurts used "Shurwest/Quantum" to refer to one entity in email correspondence with Minnesota Life.

146.   On information and belief, Quantum occupies the same office space as Debtor-Shurwest, employs the same employees as Debtor-Shurwest, is managed by the same directors as Debtor-Shurwest, and was set up as a successor entity to Debtor-Shurwest. Accordingly, Quantum is an alter ego of Debtor-Shurwest and/or the successor-in-interest to Debtor-Shurwest for the wrongdoing alleged in this Complaint.

147.    Debtor-Shurwest, in recognition of its liability exposure, and to preserver valuable Shurwest business relations that would transfer to Quantum, has settled several large exposures with large agents/broker entities doing big business with Debtor-Shurwest. Among other things, CMAM/Heritage Financial settled with Ron Shurts/Shurwest for 86% of losses of CMAM clients. Shurwest/Shurts also made settlement payments to Horton Investment Management LLC.

148.    At all relevant times herein, Quantum was Debtor-Shurwest's alter ego and/or successor-in-interest and thereby liable for the damages to Minnesota Life caused by Debtor-Shurwest's negligence.

149.    At all material times herein mentioned, Quantum, as the successor-in- interest to Debtor-Shurwest, is liable to Debtor-Shurwest's wrongdoing through the equitable doctrine of *de facto* merger. Debtor-Shurwest's business continued as Quantum, with the same employees, directors, officers, business offices, telephones, and computers as Debtor-Shurwest used in its business dealings. The creation of Quantum was a fraudulent transaction done in order to escape liability for Debtor-Shurwest's obligations.

150.    Debtor-Shurwest has damaged Class members and Plaintiffs in a total amount to be determined at trial.

151.    Class members and Plaintiffs are therefore entitled to reach beyond Debtor-Shurwest to the funds of Quantum for satisfaction of the amounts owed by Debtor-Shurwest.

## COUNT VI

### AGAINST QUANTUM UNDER ARIZONA REVISED
### STATUTES 44-1004 FOR TRANSFERS RECEIVED FROM
### DEBTOR-SHURWEST FRAUDULENT TO PRESENT AND FUTURE CREDITORS

152.    Plaintiffs repeat and reallege here all allegations previously set forth herein.

153.    Debtor-Shurwest's transfer of goods to Quantum is prohibited by A.R.S. 44-1004 as a transfer fraudulent to creditors.

154.    Debtor-Shurwest made transfer of valuable assets in 2019, 2020 and 2021 to Quantum with actual intent to hinder, delay or defraud creditors such as Plaintiffs and members

of the Class.

155. Debtor-Shurwest received no consideration or inadequate consideration in exchange for the transfers of assets and Debtor-Shurwest knew it had at the time or would incur debts beyond Debtor-Shurwest's ability to pay.

156. Debtor-Shurwest transferred assets fraudulently to an "insider," Defendant Quantum before Debtor-Shurwest was sued and/or threatened with suits.

157. The transfer was for substantially all of Debtor-Shurwest's assets.

158. Debtor-Shurwest was insolvent at the time of the transfers.

159. As a result of the foregoing, Plaintiffs and the Class members are entitled to and seek the following remedies:

(a) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(b) An attachment against the asset transfer to Quantum.

(c) Appointment of a receiver over Quantum.

## COUNT VII

## FOR EQUITABLE SUBORDINATION OF CLAIMS OF MLIC AND QUANTUM

160. Plaintiffs repeat and reallege here all allegations previously set forth herein.

161. Plaintiffs and the Class members seek an order pursuant to U.S. Bankruptcy Code Section 105(a) and Section 510(c) to equitably subordinate the claims of Quantum and MLIC to the claims of Plaintiffs and the Class on the grounds that both MLIC and Quantum creditors engaged in wrongful conduct that has harmed the Debtor-Shurwest and is the cause of Debtor-Shurwest's insolvency and/or inability to pay the claims of the Plaintiffs and the Class members in full.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

## COUNT VIII

## FOR A DETERMINATION THAT DEBTOR-SHURWEST'S
## LIABILITY TO PLAINTIFFS AND THE CLASS
## IS NOT DISCHARGEABLE PURSUANT TO 11 U.S.C. 727a(2)(A)

162.    Within one year before the Petition Date, Debtor-Shurwest transferred or removed or permitted to be transferred or removed, property, including equity, assets and funds. As of the date of the transfers or removals of Debtor-Shurwest's property, Debtor-Shurwest had one or more unsecured creditors.

163.    The transfer or removal of Debtor-Shurwest's property removed was a pre-petition distribution of Debtor-Shurwest's property to Quantum, its alter-ego.

164.    Debtor-Shurwest with intent to hinder, delay or defraud at least one creditor, transferred, or removed, or permitted to be transferred or removed, Debtor-Shurwest's property.

165.    By doing so, Debtor-Shurwest violated the provisions of 11 U.S.C. 727(a)(2)(A).

## VII.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgement against the Defendants, as follows:

A.    Entering an Order determining that Debtor-Shurwest's liability to Plaintiffs and the Class is non-dischargeable pursuant to 11 U.S.C. 523(a)(2)(A);

B.    Certifying the Class requested herein under Rule 23(b)(1)(b), (b)(2), and/or (b)(3).

C.    Entering an Order determining that any claims of Quantum, Debtor-Shurwest and/or MLIC are subordinate to the claims of Plaintiffs and the Class.

D.    Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the Class, as a result of the Defendants' liability for wrongful acts under Counts I to Count V;

E.    Order disgorgement of all monies received by Defendants as a result of sales of policies in connection with the FIP scheme;

F.    Imposing an equitable lien and constructive trust over funds traceable to Plaintiffs

1  and the Class;

2         G.     A declaratory judgment that none of the Defendants herein are entitled to a

3  discharge of any liability to Plaintiffs and the Class;

4         H.     Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs, to the

5  fullest extent allowed by law; and

6         I.     Granting all such additional or further relief as this court deems just and equitable

7  under the circumstances.

8  <u>**DEMAND FOR JURY TRIAL**</u>

9       Plaintiffs hereby demand a trial by jury on all issues so triable.

10

11                          Respectfully submitted,

12                          ZIMMERMAN REED LLP

13  Dated: May 3, 2022            By:    /s/ Hart Robinovitch
                                Hart Robinovitch

14                                  hart.robinovitch@zimmreed.com
                                14646 North Kierland Boulevard, Ste. 145

15                                  Scottsdale, AZ 85254

16                          SQUITIERI & FEARON LLP

17

18              By:    /s/ Lee Squitieri
                                Lee Squitieri *(pro hac vice pending)*

19                                  lee@sfclasslaw.com
                                305 Broadway, 7th Floor

20                                  New York, NY 10007

21                        WEXLER BOLEY & ELGERSMA LLP

22              By:    /s/ Kenneth A. Wexler
                                Kenneth A. Wexler *(pro hac vice pending)*

23                                  kaw@wbe-llp.com
                                Melinda L. Morales *(pro hac vice pending)*

24                                  kae@wbe-llp.com
                                55 West Monroe Street, Ste. 3300

25                                  Chicago, IL 60603

26                        GUSTAFSON GLUEK PLLC

27              By:    /s/ Daniel Gustafson
                                Daniel E. Gustafson *(pro hac vice pending)*

28                                  dgustafson@gustafsongluek.com

Karla M. Gluek *(pro hac vice pending)*
kgluek@ gustafsongluek.com
Amanda M. Williams *(pro hac vice pending)*
awilliams@ gustafsongluek.com
Daniel J. Nordin *(pro hac vice pending)*
dnordin@ gustafsongluek.com
Canadian Pacific Plaza
120 South Street, Ste. 2600
Minneapolis, MN 55402

*Attorneys for Plaintiffs and Proposed Class*

AMENDED CLASS ACTION COMPLAINT